Commonwealth of Pennsylvania, Acting by Attorney General Israel Packel, Plaintiff, *v.* James Tolleson and Rodney Tolleson, Defendants.
(First Opinion)

Argued March 4, 1974, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*George S. Test,* Deputy Attorney General, for plaintiff.

*James H. Joseph,* with him *Donald S. Hershman* and *Baskin, Boreman, Wilner, Sachs, Gondelman & Craig,* for defendants.

OPINION BY JUDGE KRAMER, June 19, 1974:

This matter comes within the original jurisdiction of this Court. It was commenced by the filing of a complaint in equity on February 23, 1973 by the Common-

wealth of Pennsylvania (Commonwealth) acting by its Attorney General, seeking injunctive relief under Section 4 of the Unfair Trade Practices and Consumer Protection Law, Act of December 17, 1968, P. L. 1224, 73 P.S. §201-4 (hereinafter referred to as the Act). The named defendants in the action were James Tolleson and Rodney Tolleson (hereinafter referred to collectively as Tollesons and individually by their given and surnames). The complaint alleged that the Tollesons were the owners, operators, agents, officers, or representatives of at least ten corporations or organizations through which the Tollesons were allegedly violating the Act. Arguments were held on the Commonwealth's motion for a special injunction on February 23, 1973, before this writer sitting as chancellor, and the Court on that same date issued a special injunction prohibiting the Tollesons from "conducting any solicitations, promotional activities, sales of services, or any of the activities alleged to be carried on in the allegations of the Complaint filed herein in the Commonwealth of Pennsylvania." As stated in that order, after argument by counsel for the Commonwealth and the Tollesons, the special injunction was issued on the basis that it appeared the Tollesons "may be attempting to circumvent prior orders of courts through the establishment of various corporations, companies or organizations" and "that immediate and irreparable injury will be sustained by the public before notice and formal hearing may be held to determine whether a Preliminary Injunction will issue." This special injunction was issued under the provisions of Pa. R. C. P. No. 1531. A hearing was set for February 26, 1973. By virtue of a joint petition filed by the parties, the Court continued the hearing and the efficacy of the special injunction to March 1, 1973. On March 1, 1973, the parties again jointly requested a continuance for the purpose of providing an opportunity for conference on possible settle-

ment, and the Court, by order of that date, granted the joint request. On March 14, 1973, the parties presented to the Court a stipulation seeking this Court's approval of a proposed order consented to by the parties. On March 15, 1973, this Court signed a consent order which generally provided that the Tollesons would refrain from certain enumerated acts in connection with their various businesses and would perform certain enumerated acts in carrying out said businesses. The effect of this consent order was to supersede the prior special injunction. For all practical purposes, the consent order was a preliminary injunction order. Hearings commenced on May 16, 1973 and after several continuances, one of which was to permit the Tollesons to prepare their defense at the conclusion of the Commonwealth's case, the hearings were concluded late in the fall of 1973. Proposed findings of fact and conclusions of law have been filed by both parties and the matters is now ripe for final determination.

As will be seen from the findings of fact, this is a very complicated case, made even more complicated by additional pleadings filed by the Commonwealth via petitions for civil penalties for alleged violations of the consent order. As a guide to the reader, it will be helpful to note at this point that petitions for civil penalties were filed on March 19, 1973; March 21, 1973; April 13, 1973; and July 19, 1973. At the request of and under agreement of the parties, the Court permitted testimony and evidence to be entered during the course of these hearings as a consolidated matter. The petition for civil penalties dated July 19, 1973 was heard specifically at hearings commencing on October 29, 1973; but with that exception, all the other civil penalties were included in the record as a consolidated matter. As if that were not enough, the matter was further complicated by the filing of a petition for civil penalties on April 6, 1973 in a different case docketed at No. 1106

Commonwealth Docket 1972, and at the request of the parties, testimony and evidence in that matter were received at the hearings and are included in the consolidated record. An attempt was made to prepare one opinion covering all of these matters, but that was deemed by the writer to be confusing. Therefore, this opinion will be restricted solely to the injunction proceeding and separate opinions will be filed simultaneously herewith on the petitions for civil penalties. It was necessary, however, to include many findings of fact and some discussion in this opinion which will be referred to in the other opinions by reference. It should be noted that there is an additional petition for civil penalties filed by the Commonwealth on September 7, 1973 for which no testimony or evidence has been received and therefore, that petition will not be considered in any of these opinions.

### INTRODUCTION

In order to help the reader understand this opinion, this introduction will explain who the Tollesons are and what they have done to bring about this lawsuit. James Tolleson is an individual in his early thirties who was born and reared in Alabama. James Tolleson eventually entered into the business of buying, reconditioning and selling used automobiles in the State of Ohio. James Tolleson's younger brother, Rodney, followed James and entered the same business. In May of 1969, James Tolleson was invited into a business opportunity operated by Glenn W. Turner known as Koscot Interplanetary, Inc. (Koscot). James Tolleson purchased a $5,000 Koscot cosmetics distributorship. He also became a member of Turner's "Dare To Be Great" organization, and was trained in Turner's sales and motivation courses, which provided the format for the Tollesons' future operations. After the State of Ohio moved to enjoin the Koscot marketing program because it was

alleged to be an illegal multi-level referral sales plan, Koscot changed its marketing system and thereafter for about one year, James Tolleson sold Koscot distributorships until the quota of the distributorships for the state was filled. It was at about this time that the Tollesons' automobile business was sold and Rodney Tolleson began to work with his brother as a close confidant and as a participant in the various Tolleson enterprises. On July 1, 1969, while the Tollesons were still in Ohio, Koscot had entered into an assurance of voluntary compliance with the Commonwealth covering Koscot's operations in Pennsylvania. As it developed, because of violations of that agreement, the Court of Common Pleas of Erie County issued a broad injunction against Koscot and all of its representatives and officials operating in Pennsylvania, from which no appeal was taken. Thereafter, in July of 1971, James Tolleson entered the Commonwealth of Pennsylvania as the exclusive Koscot agent in Pennsylvania. The record is clear that James Tolleson was aware of the Erie County injunction. The Tollesons embarked upon a scheme to circumvent (or comply with, depending upon your point of view) the Erie County injunction by using salesmen to sell distributorships instead of using the outright referral sales program which had been enjoined. A petition for civil penalties was filed against the Tollesons and an unincorporated unregistered organization called "American Be Independent," and the Erie County Common Pleas Court issued an order levying civil penalties. That order was appealed to this Court in yet another case at No. 189 Commonwealth Docket 1973, and an opinion in that case will also be filed simultaneously herewith.

In any event, on October 6, 1972, the Erie County Common Pleas Court ordered Koscot and the Tollesons to "cease and desist from any and all activity in the Commonwealth of Pennsylvania with the exception only,

that persons who have purchased distributorships in Koscot Interplanetary, Inc. may continue to sell the Koscot product at retail and Koscot Interplanetary, Inc. may continue to supply such product to its distributors." Immediately thereafter, on approximately November 1, 1972, the Tollesons began marketing memberships in an organization called "Century 2000" which was a travel club unconnected with Glenn Turner. As a result of the Tollesons' activity in Century 2000, the Commonwealth obtained a consent order dated November 10, 1972 (at 1106 C.D. 1972), which in effect was a permanent injunction. Alleged violations of that order brought about the petition for civil penalties in the case at No. 1106 Commonwealth Docket 1972 mentioned hereinbefore which will be covered by a separate opinion. The details of the Century 2000 operation, including the Tollesons' part therein, will be described in detail in the findings of fact. For reasons which are explained in the findings of fact, in February 1973 the Tollesons divorced themselves from the Century 2000 operation and formed a new organization called Exciting Life. The complaint in this case was filed on February 23, 1973, following the Tollesons' break with Century 2000 and the inception of their new operation.

TOLLESONS' METHOD OF OPERATION

A careful review of all of the exhibits in this case reveals that the methods of operation used by the Tollesons in this Commonwealth have been consistently very similar to the methods of operation established by their mentor, Glenn W. Turner. Although some changes were made in the product from time to time in order to circumvent the latest in a series of court orders, the sales format has remained the same. Whether the purpose was to sell cosmetics, distributorships, franchises, travel or motivation, the approach to the public has been about the same. Citizens are initially contacted by the

Tollesons, their companies or their agents through a very colorful letter. Although the letters have changed slightly in content, the message has remained the same. The letters are all sent by James Tolleson and contain a picture of James Tolleson and his family. The letters are colorfully patriotic. They directly appeal to the desire of the people to be financially independent and allude to opportunities to earn large sums of money. The letters are intentionally vague and no details whatsoever concerning a specific company or a specific product are disclosed. The letters refer to "fantastic" or "unbelievable" business opportunities, but contain no information concerning the opportunities. The recipient is urged in the letter to complete a reply card. Upon receipt by the Tolleson organizations of the card, the "prospect" is invited to attend a Get-Acquainted meeting. The Tollesons also utilize a process known as "head hunting" whereby agents or employes develop prospects without the use of the letter. Between ten and sixty persons attend the Get-Acquainted meeting, which is sometimes referred to as a "Golden Opportunity" meeting. Get-Acquainted meetings last about two hours and follow a uniform format from a script prepared by persons in the Tolleson organizations. The Tollesons may or may not attend such meetings, but the audience is usually composed of about fifty percent Tolleson personnel. The meetings are run in a fast manner with contrived applause, laughter, shouting and singing, all led by the Tolleson personnel in the audience. The prospects are shown motivation movies. By way of cleverly designed innuendo, they are led to believe that if they join the organization, they can earn anywhere from $25,000 to $50,000 per year. At this Get-Acquainted meeting, both the name of the organization and the business involved remain undisclosed. Thereafter, if the prospect is still interested, he is invited to a weekend meeting which normally is held in some distant

area, i.e., the Bahamas or Florida. The price of the trip to these meetings is apparently low and the prospect of an inexpensive trip or cheap vacation is used to induce attendance. After several meetings during the weekend at which the prospects are once again exposed to contrived applause, laughter, singing and excitement, the prospects are pressured into signing contracts and paying money for their memberships.

Most of the Commonwealth's witnesses described all of these meetings as being carnival-like or similar to revival meetings. All of these witnesses described peer pressure, embarrassment and great expectations, all of which caused many people to pay money to join something which was never fully explained to them. The record quite clearly indicates that information was intentionally withheld from the prospects. There were on many occasions intentional denials that the Tollesons had ever had any connection with Glenn Turner. The evidence clearly establishes that none of the prospects were ever advised on where their money went or for what it was used. As a matter of fact, the record makes clear that only the Tollesons were aware that the monies, which the prospect intended to be paid into the organization they were joining, were in fact diverted to other Tolleson organizations. Even the trusted lieutenants and officers of some of the Tolleson organizations did not know of the existence of other corporations with the same or similar names, or how they fit into the Tolleson corporate structure. With the exception of the Koscot operation, the Tollesons were not directly connected with Glenn W. Turner in the business operations involved in the cases covered by this opinion, but the flavor of a Turner operation permeates everything the Tollesons have done.

The chancellor was provided the opportunity at the hearings in these matters to observe and hear the various witnesses. At the request of counsel for the par-

ties, all the witnesses for both the plaintiff and the defendants were sequestered for all the hearings before the chancellor except for the two Tolleson brothers who were present at all times for all hearings. Throughout the hearings the testimony of the sequestered Commonwealth witnesses was generally consistent, while the testimony of the sequestered Tolleson witnesses was often inconsistent. The testimony of the Tolleson brothers was both inconsistent and evasive. The hearings in this case were long and complicated. They involved not only the complex corporate structure and businesses of the defendants, but also the emotions and personal interests of all persons concerned. It is not at all surprising that there were conflicts in the testimony. The chancellor has utilized the entire record together with his observations of these witnesses (including their demeanor and sincerity) in order to carry out his duty of resolving the conflicts and differences in the testimony. Although, admittedly, it is sometimes difficult to discern which of the conflicting witnesses has told the truth and which has distorted the truth, the task of the factfinder is to use his sound and impartial discretion to resolve the conflicting matters. The following findings of fact are the result of that process.

### FINDINGS OF FACT

#### IDENTIFICATION OF PARTIES AND ENTITIES INVOLVED

1. Plaintiff is the Commonwealth of Pennsylvania acting by its Attorney General.

2. Defendant James E. Tolleson is an adult individual residing at Altamonte Springs, Florida.

3. Defendant Rodney W. Tolleson is an adult individual residing at Altamonte Springs, Florida. At some time between June 28, 1973 and September 18, 1973, Rodney W. Tolleson changed his residence from Pennsylvania to Florida.

4. The Tollesons have conducted or are conducting businesses within the Commonwealth of Pennsylvania through the following business entities, the operations of which they control, but for which James E. Tolleson is the owner and chief corporate officer.[1]

(a) Exciting Life, Inc. is a Florida not-for-profit corporation (organized on April 13, 1973) (hereinafter referred to as "Exciting Life-Florida"). Exciting Life-Florida is sometimes known as and referred to as Exciting Life Travel and Success Club and was not registered in Pennsylvania.

(b) Exciting Life, Inc. is a Delaware corporation (organized on June 25, 1973) (hereinafter referred to as "Exciting Life-Delaware").

(c) Exciting Life Enterprises, Inc. is a Delaware corporation (organized on May 25, 1973). The term "Exciting Life" was used loosely by the Tollesons and their agents without any explanation on the distinction between the various organizations bearing the name. Even high-ranking officials in the Tolleson organizations did not know of the existence of different companies bearing the same or similar name.

(d) American Opportunities Unlimited, Inc., a Delaware corporation (organized on November 30, 1972) was utilized from about November 1, 1972.

(e) Empire Enterprises, Inc. is an Ohio corporation (organized on November 9, 1970).

(f) Think and Grow Rich, Inc. is a Delaware corporation (organized on June 11, 1973). It is also referred to in the record as being a Florida corporation. It was utilized prior to incorporation.

(g) Golden Opportunities Finders Unlimited, Inc. is a Delaware corporation (organized on November 30, 1972).

---

[1] All dates of organizations contained in this finding were supplied in the Tollesons' proposed findings of fact, but were not made part of the record.

(h) Adventures in Salesmanship, Inc. is a Delaware corporation (organized on November 30, 1972).

(i) All American Success, Inc. is a Delaware corporation (organized on November 15, 1972).

(j) American Be Independent, Inc. is a Delaware corporation (organized on November 15, 1972). American Be Independent was also used at times as a trade style without being registered anywhere.

(k) Eagle Aviation, Inc. was a name used but apparently inactive at the time of trial.

(l) JET Travel Services, Inc. is a Delaware corporation (organized on May 3, 1973). JET Travel Services, Inc. was also the name of Exciting Life Enterprises, Inc. prior to June 30, 1973 when the name was changed to Exciting Life Enterprises, Inc. as a part of a reorganization involving that corporation and No-Glug Jug Corporation (now JET Travel Services, Inc.).

(m) No-Glug Jug Corporation was the name of JET Travel Services, Inc. prior to a reorganization on June 30, 1973 involving that corporation and Exciting Life Enterprises, Inc. (formerly JET Travel Services, Inc.).

5. Each of the above-listed corporations has failed to register with the Secretary of State for the Commonwealth of Pennsylvania as either a foreign corporation doing business in the Commonwealth or as a fictitious name. None of the above-listed corporations have registered with the Secretary in any manner whatsoever. With the exception of Empire Enterprises, Inc., the Tollesons used the corporate or fictitious names before any incorporation; and as already noted herein, the fact of incorporation of them was not made a part of the record, but rather was alluded to in the Tollesons' proposed findings of fact.

6. Koscot Interplanetary, Inc. (Koscot) is apparently a Florida corporation owned, or controlled by Glenn W. Turner, doing business in Pennsylvania. From July 1971 to November 1, 1972, James E. Tolle-

son was the exclusive and controlling agent in Pennsylvania for Koscot. Rodney W. Tolleson was sales manager (in addition to other titles) for Koscot for the same period.

7. On June 30, 1973, No-Glug Jug Corporation (now JET Travel Services, Inc.) acquired all of the outstanding capital stock of JET Travel Services, Inc. (now Exciting Life Enterprises, Inc.) in a transaction whereby James E. Tolleson became the legal, beneficial, or controlling owner of 1,600,000 shares of the capital stock ($0.01 par value per share) of No-Glug Jug Corporation (now JET Travel Services, Inc.) which gave him control of that corporation. As a part of that transaction, No-Glug Jug Corporation was renamed JET Travel Services, Inc. and the former JET Travel Services, Inc. was renamed Exciting Life Enterprises, Inc. In June of 1973, coincidental with its acquisition by No-Glug Jug Corporation (now JET Travel Services, Inc.), Exciting Life Enterprises, Inc. (formerly JET Travel Services, Inc.) acquired all of the outstanding capital stock of Think and Grow Rich, Inc., All American Success, Inc. and Exciting Life-Delaware (the record is not clear whether Delaware or Florida) from James E. Tolleson.

8. Since June 29, 1973, JET Travel Services, Inc. (formerly No-Glug Jug Corporation) has been a holding company whose shares of capital stock are allegedly traded over-the-counter and reported daily in the pink sheets by the National Quotation Bureau.[2]

9. Since June 29, 1973, the sole asset of JET Travel Services, Inc. (formerly No-Glug Jug Corporation) has been all of the outstanding shares of capital stock of Exciting Life Enterprises, Inc. (formerly JET Travel Services, Inc.).

10. Since June 29, 1973, the assets of Exciting Life Enterprises, Inc. (formerly JET Travel Services, Inc.)

---

[2] This is mentioned in the record, but not satisfactorily proven.

have consisted solely of all of the outstanding shares of capital stock of Exciting Life-Delaware, All American Success, Inc. and Think and Grow Rich, Inc.

11. Since June 29, 1973, American Opportunities Unlimited, Inc., Adventures in Salesmanship, Inc. and Golden Opportunities Finders Unlimited, Inc. have been wholly-owned subsidiaries of Empire Enterprises, Inc.

12. Prior to incorporation of American Be Independent, Inc., the name or style "American Be Independent" was used by the Tolleson brothers as a trade name in association with the Koscot sales incentive programs.

13. The term "Golden Eagles" has been used as an unregistered trade name in connection with the Tollesons' operations.

14. James E. Tolleson is the Chairman of the Board of Directors of Exciting Life-Florida, Exciting Life-Delaware, American Opportunities Unlimited, Inc., Empire Enterprises, Inc., Think and Grow Rich, Inc., All American Success, Inc., Adventures in Salesmanship, Inc., American Be Independent, Inc., Golden Opportunities Finders Unlimited, Inc., JET Travel Services, Inc. (formerly No-Glug Jug Corporation) and Exciting Life Enterprises, Inc. (formerly JET Travel Services, Inc.) Rodney W. Tolleson is the National Sales Director of Exciting Life-Delaware, the President of American Opportunities Unlimited, Inc., Vice President of American Be Independent, Inc. and Vice President of Empire Enterprises, Inc.

15. By virtue of his position of Chairman of the Board of Directors, and his legal and beneficial ownership of the majority of the outstanding capital shares of JET Travel Services, Inc. (formerly No-Glug Jug Corporation), James E. Tolleson controls and directs the activities of JET Travel Services, Inc. (formerly No-Glug Jug Corporation), Exciting Life Enterprises, Inc. (formerly JET Travel Services, Inc.), All Ameri-

can Success, Inc., Think and Grow Rich, Inc. and Exciting Life-Delaware.

16. By virtue of his position as Chairman of the Board of Directors and his legal and beneficial ownership of all of the outstanding capital stock of Empire Enterprises, Inc., James E. Tolleson controls and directs the activities of Empire Enterprises, Inc., American Opportunities Unlimited, Inc., Golden Opportunities Finders Unlimited, Inc., Adventures in Salesmanship, Inc. and American Be Independent, Inc.

17. Since their organization, Exciting Life-Florida, Exciting Life-Delaware, Exciting Life Enterprises, Inc., Think and Grow Rich, Inc., American Opportunities Unlimited, Inc., All American Success, Inc. and American Be Independent, Inc. have maintained their offices and principal places of business at 701 East Semoran Boulevard, Altamonte Springs, Florida.

18. Since November 1, 1972, Empire Enterprises, Inc. has maintained its office and principal place of business at 701 East Semoran Boulevard, Altamonte Springs, Florida. For some period of time prior, it maintained its office and principal place of business at 3404 Hamilton Boulevard, Allentown, Pennsylvania, and prior to that at some undisclosed address in Ohio.

19. From its inception until July of 1973, Golden Opportunities Finders Unlimited, Inc. maintained its office and principal place of business at REA Aviation Building, A-B-E Airport, Airport Road, Allentown, Pennsylvania.

20. Yet another corporation involved is Century 2000, Inc. It is a Florida not-for-profit corporation certified by the Federal Aviation Administration as an air travel club. It was not controlled by either Tolleson, as will be mentioned hereinafter. The Tollesons and their agents, at various and convenient times, stated that James E. Tolleson owned 51%, or otherwise controlled Century 2000, Inc.

21. Masco Industries, Inc. is either a Florida or Delaware corporation. It was owned and controlled by Jack Plumly and James Shaw. Masco Industries, Inc. leased aircraft to Century 2000, Inc.

22. Century 2000, Inc. was controlled by Jack Plumly, James Shaw and Stonewall Felton. James E. Tolleson never owned controlling interest in either Masco Industries, Inc. or Century 2000, Inc., nor did he control or direct their activities.

23. Century 2000, Inc. and Masco Industries, Inc. maintained combined offices in Miami, Florida.

24. Insofar as this record discloses, Glenn W. Turner has no connection with Exciting Life-Florida, Exciting Life-Delaware, American Opportunities Unlimited, Inc., Empire Enterprises, Inc., Think and Grow Rich, Inc., All American Success, Inc., Adventures in Salesmanship, Inc., Golden Opportunities Finders Unlimited, Inc., JET Travel Services, Inc. (formerly No-Glug Jug Corporation), Exciting Life Enterprises, Inc. (formerly JET Travel Services, Inc.) or Century 2000, Inc.

## KOSCOT OPERATIONS

25. In May of 1969, James E. Tolleson purchased a distributorship offered by Koscot Interplanetary, Inc. in the State of Ohio. Prior to his purchase of a Koscot distributorship, James E. Tolleson had not engaged in the business of offering franchises or distributorships for sale.

26. Shortly after James E. Tolleson purchased his Koscot distributorship, the marketing program of that company (whereby distributors and subdistributors earned fees or commissions for sponsoring and selling other distributorships and subdistributorships) was changed and distributorships were ostensibly offered on a direct or single-level basis. New distributors in the State of Ohio could no longer earn fees or commissions

by sponsoring other new Koscot distributors. Thereafter James E. Tolleson sold Koscot distributorships on a direct or single-level basis in the State of Ohio until June or July of 1970 when Koscot reached its quota of distributors in Ohio.

27. James E. Tolleson requested that Koscot permit him to sell 1,500 unsold distributorships in the State of California by establishing a sales company to direct-market such distributorships, whereupon Koscot replied that in order to sell the distributorships in California, James E. Tolleson would have to prove his ability by first selling 500 unsold distributorships in the Commonwealth of Pennsylvania.

28. James E. Tolleson obtained from Koscot the exclusive rights to sell the 500 unsold distributorships on a commission basis in the Commonwealth of Pennsylvania, sometime in July of 1971.

29. James E. Tolleson had utilized Empire Enterprises, Inc., which he organized in the State of Ohio, as a corporate device in the conduct of his Koscot business.

30. James E. Tolleson found that most of the existing Koscot distributorships in the Commonwealth of Pennsylvania had been sold in Western Pennsylvania, and therefore he established an office in Allentown, Pennsylvania to broker the remaining Koscot distributorships.

31. James E. Tolleson used the unregistered name or term "Golden Eagles" in reference to his Ohio sales organization, and carried that term into the Commonwealth of Pennsylvania.

32. "Golden Eagles" was used as a trade style or public relations gimmick intended to appeal to one's patriotic senses. Later a large Golden Eagle pin or clasp was developed. It was intended and represented by the Tollesons to be an outward manifestation or

honor badge for sales persons who earned more than $100,000 per year in the Tolleson organizations.

33. James E. Tolleson used the name or style of "American Be Independent" for his Koscot sales organization in the Commonwealth of Pennsylvania. "American Be Independent" was never registered in Pennsylvania.

34. James E. Tolleson used a direct mail letter (in addition to other methods) to solicit Pennsylvania residents to purchase Koscot distributorships. The letter was designed to encourage replies from interested persons with certain qualifications and to discourage replies from uninterested and unqualified persons.

35. The largest number of commissioned salesmen employed by James E. Tolleson or Empire Enterprises, Inc. in the Koscot operation prior to the proceedings in Erie County on November 9, 1972, was forty to fifty, under whom 260 to 270 distributorships were sold. With minor fluctuations, the number of salesmen working for James E. Tolleson and/or Empire Enterprises, Inc. increased from six to forty or fifty.

36. A substantial number of the commissioned salesmen employed by James E. Tolleson and/or Empire Enterprises, Inc. to sell Koscot distributorships in the Commonwealth of Pennsylvania were themselves Koscot distributors, although not all were.

37. The salesmen commissioned by James E. Tolleson and/or Empire Enterprises, Inc. to sell Koscot Interplanetary, Inc. distributorships were called "State Developers" and received their position and title by appointment of either James E. Tolleson or Rodney W. Tolleson.

## CENTURY 2000 OPERATIONS

38. At the time Koscot was permanently enjoined from the sale of distributorships in the Commonwealth of Pennsylvania, James E. Tolleson or Empire Enter-

prises, Inc. had an investment in Century 2000. Century 2000 had existed as an air travel club for seven years preceding the Koscot injunction.

39. Century 2000 was not created by James E. Tolleson but was used by him to avoid the imperatives of the Erie County Court of Common Pleas with respect to the sale of Koscot distributorships. The Tolleson sales system remained the same but the product was changed from cosmetics to travel club memberships.

40. Prior to the Erie County injunction, James E. Tolleson, individually or through Empire Enterprises, Inc., had advanced about $30,000 to Century 2000 and had used Century 2000 aircraft to transport prospective purchasers of Koscot distributorships to Orlando, Florida.

41. At various times, James E. Tolleson and several of his agents, servants, employes or representatives, represented to prospective purchasers that he owned the controlling interest in, or otherwise controlled, Century 2000. In fact, James E. Tolleson did not own or control Century 2000.

42. Prior to the Erie County injunction, the Tollesons had considered marketing Century 2000 memberships. As early as August of 1972, James E. Tolleson had considered using some of his sales representatives to sell Century 2000 memberships.

43. On or about November 1, 1972, thirty or forty State Developers of the Tolleson operations commenced the sale of Executive Memberships in Century 2000; these State Developers used to sell Executive Memberships in Century 2000 were the same State Developers who sold Koscot distributorships in the Commonwealth of Pennsylvania.

44. The then recent purchasers of Koscot distributorships in the Commonwealth of Pennsylvania were not offered the opportunity to transfer their distributorships to Century 2000 Executive Memberships.

45. In the Consent Permanent Injunction of November 10, 1972, the Tollesons agreed to make many changes in their Century 2000 sales program. Many of the changes agreed to in the Consent Injunction were not in fact made, and approximately three months after the Consent Injunction the Tollesons broke with Century 2000 and formed their own travel club (Exciting Life Travel and Success Club). The sales program of Exciting Life remained basically the same as the Century 2000 sales program.

46. In the Consent Injunction of November 10, 1972, the Tollesons agreed to limit Century 2000 Executive Memberships to 20 in a trading district of 500,000 population, and to allow each Executive Member to sell a maximum of 500 Regular Memberships. Some prospective Members were told by the Tollesons or their agents to utilize addresses outside the trading district (or sales area) where the prospect resided.

47. At or about the time James E. Tolleson commenced the sale of Executive Memberships in Century 2000, both American Be Independent, Inc. and American Opportunities Unlimited, Inc. were incorporated, and both became subsidiaries of Empire Enterprises, Inc., which became a holding company. Thereafter, State Developers were employed and commissioned by American Opportunities Unlimited, Inc. and did not broker Koscot distributorships.

48. In December of 1972, Empire Enterprises, Inc. acquired the international marketing rights to the works of Dr. Napoleon Hill (except books) which were assigned to Think and Grow Rich, Inc., which had been incorporated for the purpose of selling self-improvement courses and materials.

49. Think and Grow Rich, Inc. never offered business opportunities to residents of the Commonwealth of Pennsylvania, but it did provide Napoleon Hill materials for the use of Executive Members of Century

2000 and State Developers employed by American Opportunities Unlimited, Inc.

50. Beginning in November of 1972, Executive Members of Century 2000, and State Developers employed by American Opportunities Unlimited, Inc., were trained by All American Success, Inc. which had been incorporated for that purpose.

51. Prior to November of 1972, training of State Developers and Koscot distributors was performed by a division of Empire Enterprises, Inc. That division was later incorporated as All American Success, Inc. As already noted, none of these corporations were ever registered to do business in Pennsylvania.

52. Century 2000, Inc. offered two classes of memberships in the Commonwealth of Pennsylvania: (a) Regular Memberships (sometimes called Traveling Memberships) and (b) Executive Memberships. Regular Memberships were offered in the Commonwealth of Pennsylvania for the price of $200. Executive Memberships were at first offered in the Commonwealth of Pennsylvania for the price of $5,000 but the price was later raised to $5,500.

53. Executive Memberships were referred to as the "business" and Regular Memberships were referred to as the "product."

54. The purchaser of a $200 Regular Membership received Century 2000 trip schedules and the opportunity to participate in travel programs at Century 2000 club rates.

55. The purchaser of an Executive Membership in Century 2000 received: (a) a Regular Membership in Century 2000; (b) the right to sell or enroll 500 Regular Members in Century 2000 at a commission of fifty (50%) percent; (c) training at both a Regional and a National Training School; (d) a "Winner's Success Kit" provided by Think and Grow Rich, Inc.; (e) the right to receive training for every Membership Re-

cruiter which may be employed by the Executive Member on a commission basis to assist him in the sale of Regular Memberships.

56. Century 2000, Inc. apparently had an arrangement with American Opportunities Unlimited, Inc. whereby American Opportunities Unlimited, Inc. was granted the exclusive right to sell Century 2000 Executive Memberships in the Commonwealth. The apparent purpose of American Opportunities Unlimited, Inc. was to broker business opportunities. Although the purchasers were joining Century 2000 (not owned by James Tolleson), their money was paid to American Opportunities, which had no agreement with Century 2000. On at least one occasion, the money was paid to a State Developer.

57. Solicitations to purchase Executive Memberships in Century 2000 were made by State Developers of the James E. Tolleson operations who were paid a commission for their efforts in selling such franchises. Neither the qualifications of nor the manner of appointment of a State Developer was ever explained on the record.

58. The defendants allege that Regular Members in Century 2000 did not, directly or indirectly, purchase any right to solicit offers to purchase Executive or Regular Memberships or to otherwise receive fees, commissions or other compensation, directly or indirectly, for soliciting such offers. However, Regular Members were, in fact, offered jobs as Membership Recruiters. The commissions available to Membership Recruiters were used to induce prospects to buy Regular Memberships.

59. In the belief that James E. Tolleson, through his Century 2000 operators, was seeking to avoid the imperatives of the Erie County Court of Common Pleas relating to the sale of Koscot distributorships, the then Attorney General of the Commonwealth of Pennsylvania commenced an injunction proceeding against James

E. Tolleson and Rodney W. Tolleson in Commonwealth Court in November of 1972. This suit resulted in the Consent Injunction of November 10, 1972, in which the Tollesons agreed and were directed to make certain changes in their Century 2000 sales program.

## EXCITING LIFE OPERATIONS

60. Sometime between mid-January of 1973 and February 14, 1973, the relationship between Century 2000 and American Opportunities Unlimited, Inc. and/or James E. Tolleson, was dissolved. The Tollesons allege that the relationship was dissolved, either because it was terminated by Century 2000, because of James E. Tolleson's unwillingness to continue his association with Century 2000, because of his dissatisfaction with his business relationship with Century 2000, or because of the temporary loss of Section 123 certification of Century 2000 as an air travel club by the Federal Aviation Administration. Although some or all of these factors may have affected the decision to dissolve the relationship, the existence of the November 10, 1972 Consent Injunction was largely responsible for the decision to break with Century 2000.

61. On February 14, 1973, James E. Tolleson and Rodney W. Tolleson advised State Developers of American Opportunities Unlimited, Inc. and Executive Members of Century 2000 that the relationship between Century 2000 and James E. Tolleson was dissolved because of his inability to direct the affairs of Century 2000, that Exciting Life Travel and Success Club was replacing Century 2000, that Executive Members of Century 2000 could transfer their memberships to Exciting Life Travel and Success Club, that future Executive Memberships in Exciting Life Travel and Success Club would be offered for $6,500 to residents of the Commonwealth of Pennsylvania, that Regular Memberships would be offered for $1,000, and that all mem-

berships would include a motivation and self-development course. There was no meaningful disclosure on what Exciting Life was for legal, financial or investment purposes.

62. For some time prior to February 14, 1973, although James E. Tolleson had made a decision to split with Century 2000 and form a new travel club, he and his representatives continued to sell Century 2000 memberships without disclosing that decision to prospective purchasers.

63. On February 23, 1973, in the belief that the Tollesons were seeking to avoid the previous Koscot injunction and the Century 2000 consent injunction, the Attorney General of the Commonwealth of Pennsylvania commenced an action in the Commonwealth Court of Pennsylvania, sought therein, and obtained (after argument at which counsel for the Tollesons was present), a special injunction prohibiting the Tollesons from offering to sell any product or service whatsoever in the Commonwealth of Pennsylvania. After jointly agreed to continuances, this Court on March 15, 1973 approved and filed a consent preliminary injunction which permitted the Tollesons to offer for sale in the Commonwealth of Pennsylvania Regular and Family Memberships in Exciting Life Travel and Success Club, but which prohibited the sale of Executive Memberships and restricted specifically the manner in which the permissible memberships could be sold.

64. Exciting Life was represented to be a travel and success club which sought to bring in association persons with a desire to travel and to achieve financial success.

65. At no time was any disclosure made to any prospective purchaser of the fact that there were two or more Exciting Life corporations, or that the Exciting Life not-for-profit Florida corporation existed, or what the club they were joining was in fact. The de-

fendants and their associates deceitfully described the corporate organizations in vague, general and misrepresentative terms.[3]

66. The Consent Injunction of March 15, 1973 banned the sale of Executive Memberships in Exciting Life. Since March of 1973, the Tollesons have continued to solicit and receive Executive Membership applications in Pennsylvania to and from out-of-state prospects.

67. Exciting Life Family Memberships were offered in the Commonwealth of Pennsylvania for the price of $1,000. Until April of 1973, Regular Memberships were not offered; thereafter to September 10, 1973, they were offered for $250, and after that, for $300.

68. The purchaser of a $1,000 Family Membership in Exciting Life receives: (a) an embossed membership card for member and spouse which qualifies and admits member, spouse, and children under the age of 21 to all Exciting Life Travel and Success Club activities and travel at club rates; (b) notice of Exciting Life Travel and Success Club activities and trips sponsored by the member's local chapter; (c) Napoleon Hill and E. Harold Keown's course, "The Science of Personal Achievement"; (d) Napoleon Hill and Charles Cranford's course, "The Science of Professional Selling"; (e) attache cases with cassette recorder-player to contain 14 cassette tapes and written material for "The Science of Personal Achievement" and "The Science of

---

[3] The differences between the various Exciting Life organizations apparently were revealed for the first time at the hearing held hereon, for even some of the Tollesons' trusted and high-ranking associates did not know of the differences on the witness stand. All of these organizations were referred to by defendants orally and in writing as "Exciting Life," and because of this the chancellor will use the term as related to the club, and will note the state of incorporation where otherwise intended.

Professional Selling" courses; (f) Ten Family Seminar coupons; (g) subscription to the Exciting Life Magazine.

69. The purchaser of a Regular Membership in Exciting Life receives: (a) an embossed membership card for member and spouse which qualifies and admits member, spouse, and children under the age of 21 to all Exciting Life Travel and Success Club activities and travel at club rates; (b) Two Family Seminar coupons; (c) subscription to Exciting Life Magazine; (d) notice of Exciting Life Travel and Success Club activities and trips.

70. Sales of Regular and Family Memberships in Exciting Life are offered in the Commonwealth of Pennsylvania through representatives of Exciting Life called Executive Members.

71. Executive Members of Exciting Life ostensibly do not constitute a separate class of membership in Exciting Life, but, rather, are persons who purchase a franchise from Exciting Life, Inc. (Delaware) in order to be eligible to solicit offers to purchase Family and Regular Memberships in Exciting Life. The Executive Member Franchise is referred to as the "business" and the Regular and Family Memberships as the "product."

72. The Exciting Life Executive Member Franchise was offered to residents of the Commonwealth of Pennsylvania for the price of $6,500, for which the purchaser was to receive: (a) a Family Membership in Exciting Life Travel and Success Club; (b) the right to enroll 500 Family Members in Exciting Life Travel and Success Club and receive thereon 50% commission; (c) the right to enroll an unlimited number of Regular Members in Exciting Life and Success Club and receive a 50% commission; (d) a license to use in connection with the sale of Family and Regular Memberships in Exciting Life Travel and Success Club, all of the signs, emblems, trademarks, service marks and the

color scheme of Exciting Life Travel and Success Club, together with its merchandising methods and other confidential and valuable information as may from time to time be imparted to the Executive Member; (e) training at the member's expense at a Regional and National School established by All American Success, Inc. on behalf of Exciting Life-Delaware; and (f) training for each Membership Recruiter which may be employed by the Executive Member to assist him in the sale of Regular and Family Memberships in Exciting Life Travel and Success Club.

73. The Tollesons and their agents intentionally failed to disclose to prospective members in both Century 2000 and Exciting Life that a yearly membership fee was required in addition to the initial purchase price or membership fee.

74. Exciting Life Executive Members may employ Membership Recruiters to assist them in the sale of Regular and Family Memberships in Exciting Life. Membership Recruiters are paid varying (suggested but not controlled by Exciting Life) commissions by the Executive Member who employs them. Exciting Life-Delaware recommends that Executive Members pay Membership Recruiters a commission of 20% of the purchase price of each Family and Regular Membership which they assist the Executive Member in selling and provides a form of agreement for use between Executive Members and Membership Recruiters. There is no established standard or qualification for a Membership Recruiter.

75. It is not a condition precedent to employment as an Exciting Life Membership Recruiter that the Membership Recruiter purchase or offer to purchase a membership in Exciting Life, but prospects are offered positions as Membership Recruiters in order to induce them to purchase memberships.

76. The offer or promise of commissions to the buyer for the procurement of contracts of purchase with others is an inherent part of the Tolleson sales system at all levels.

77. The alleged distinction between Executive Members and commissioned salesmen (State Developers), and between Regular Members and Membership Recruiters, is merely an artifice used by the Tollesons in an attempt to evade the strictures of the Act and court orders.

78. Executive Members of Exciting Life have very rarely employed persons as Membership Recruiters who are not members of Exciting Life.

79. Some Regular and Family Members of Exciting Life are not employed by Executive Members as Membership Recruiters and neither sell nor solicit offers to purchase memberships in Exciting Life. However, many Regular and Family Members are Membership Recruiters and the offer of the opportunity to be a Membership Recruiter is used to induce the purchase of Regular and Family Memberships.

80. Solicitations to purchase Exciting Life Executive Member Franchises are made by State Developers of the Tolleson organization who are paid a commission for their efforts in selling such franchises. Almost all State Developers have at some time purchased some sort of franchise or Executive Membership from the Tollesons.

81. State Developers are paid a commission of $1,000 on each franchise which they sell, followed by a $500 bonus when each Executive Member Franchisee completes training, plus a possible bonus (never adequately explained in the record) of $250 or $300 on Christmas and the Fourth of July. State Developers are employed by American Opportunities Unlimited, Inc.

82. Ostensibly, State Developers tender no consideration, directly or indirectly, in order to qualify for employment by American Opportunities Unlimited, Inc. as salesmen of Exciting Life Executive Member Franchises. However, the record indicates that they sometimes purchased stock or interests in other Tolleson organizations, e.g., JET Travel Service, Inc., and that many of them purchased either a Koscot franchise or some sort of Executive Membership from the Tollesons.

83. Some Exciting Life Executive Members have not been employed as State Developers.

84. Most State Developers are also Executive Members in Exciting Life.

85. Of those State Developers who are also Executive Members in Exciting Life: (a) some purchased their Executive Member Franchises and memberships after their employment as State Developers and (b) some purchased their Executive Member Franchises prior to their employment as State Developers.

86. Exciting Life-Delaware was granted the exclusive right to sell memberships in Exciting Life-Florida.

87. Ostensibly, Exciting Life-Delaware has an unwritten arrangement with American Opportunities Unlimited, Inc. which gives American Opportunities Unlimited the right to broker Executive Member Franchises in Exciting Life.

88. Ostensibly, Exciting Life-Florida and Exciting Life-Delaware have an unwritten arrangement with Think and Grow Rich, Inc. whereby Think and Grow Rich, Inc. provides Napoleon Hill motivational and self-development materials to Family Members of Exciting Life.

89. Think and Grow Rich, Inc. is the exclusive distributor of Napoleon Hill materials (other than books) in the United States.

90. Ostensibly, Exciting Life-Delaware has an unwritten arrangement with All American Success, Inc.

whereby All American Success, Inc. provides training to State Developers, to Executive Member Franchisees and to Membership Recruiters employed by Executive Member Franchisees.

91. The sale of Executive Member Franchises by State Developers, the sale of Regular and Family Memberships of Executive Member Franchisees, and Exciting Life club activities are supervised and directed by a hierarchy of persons denominated successively as Team Leaders, Motivators, Area Coordinators, Area Directors, District Directors, Regional Directors and the National Sales Manager. All such persons are appointed to their respective positions in an unexplained manner by the Tollesons.

92. Team Leaders are Executive Members, Membership Recruiters or Sales Managers who organize and head groups of persons in coordinated sales programs. Team Leaders are not salaried for their activities, but may receive compensation through commissions for sales made by them or through others.

93. A Motivator is a person whose responsibilities include motivating the sales efforts of participants in the franchise and membership sales programs. The Motivator is not compensated directly for his activities.

94. Area Coordinators are persons who coordinate and arrange meetings, trips and other activities in a small geographic area in their sales solicitation activities. Area Coordinators are not salaried, but may be compensated for their activities in the same manner as Team Leaders.

95. Area Directors are persons who organize and supervise the sales solicitation activities of State Developers, Executive Members and Membership Recruiters in a small geographic area. Area Directors are compensated by Exciting Life-Delaware on the basis of a percentage of gross sales of franchises and memberships in a small geographic area. They organize meetings, collect checks and speak at meetings.

96. District Directors are persons who organize and supervise the organizational and sales solicitation activities of Area Directors in a larger geographic area, usually an entire state. The District Directors are compensated by Exciting Life-Delaware on the basis of a percentage of gross sales of franchises and memberships in their district.

97. Regional Directors are State Developers who organize and supervise the organizational and sales solicitation activities of District Directors in a multistate region. Regional Directors are compensated by Exciting Life-Delaware on the basis of a percentage of gross sales of franchises and memberships in their region.

98. The National Sales Manager (Rodney Tolleson) organizes and supervises District Directors in their organizational and sales solicitation activities. The National Sales Manager is compensated by Exciting Life-Delaware on the basis of a percentage of gross sales of franchises and memberships nationwide.

99. The aggregate commissions paid to Area, District and Regional Directors and the National Sales Manager constitute approximately 10% of the gross sales price of franchises and memberships.

100. At at least one meeting held in Gettysburg, Pennsylvania in July of 1973, Pennsylvania prospects were informed by the agents of the Tollesons that if the prospects would purchase a $1,000 membership, thereafter they would have the right to sell five such memberships for a commission of $200 each and thereby recoup their investment, and thereafter become a Membership Recruiter.

THE SALES PROCESS

OBTAINING LEADS

101. A "Red, White and Blue Letter" was originally designed to obtain leads for persons interested in

purchasing a Koscot distributorship. The letter is similar to the letter used by the Glenn W. Turner organizations. The letter was designed to encourage its recipients to reply if they were interested in earning large sums of money. It discouraged people who were not married. It was intended to eliminate skeptical people and to locate people who were open-minded, ambitious, aggressive and in a particular age bracket. No pertinent disclosures were ever made in these letters concerning the name of any company, or even the nature of the business. In their various ventures, the Tollesons mailed hundreds of thousands of such letters.

102. Persons (prospects) who replied to the aforementioned letter were then contacted by representatives of the Tollesons and invited to attend meetings denominated "Get Acquainted" or "Golden Opportunity" (sometimes just "GO") meetings. Approximately 10 days usually elapsed between the time prospects replied to a "Red, White and Blue Letter" and the time they were contacted.

103. State Developers were instructed to pick up prospects at their homes in expensive automobiles and take them to the Get-Acquainted Meetings because the ride would give the prospects an opportunity to know the State Developer, impress the prospects with the wealth of same, and would insure the attendance of the prospects at the Get-Acquainted Meeting.

THE GET-ACQUAINTED MEETING

104. The Get-Acquainted Meeting is considered a qualifying step in the sales process and is intended to acquaint prospects with the State Developers and their way of thinking. Normally, no selling occurs at the Get-Acquainted Meeting because it is designed to be devoted to the concept of going into an independent business. The Get-Acquainted Meeting eliminates many undesirable prospects.

105. Prospects are not told, either before they attend the Get-Acquainted Meeting or during the meeting, the name of the sponsoring organization or the nature of the business opportunity offered.

106. There are as many as three Get-Acquainted Meetings held during each week. There are normally about 30 persons present at the Get-Acquainted Meetings, and the largest Get-Acquainted Meeting had an attendance of 50-60 persons. Approximately 50% of the people present at these meetings are Tolleson personnel.

107. Get-Acquainted Meetings span 2-2½ hours and are of a uniform nature in that they strictly follow a Tolleson organization prepared script.

108. Persons in attendance at the Get-Acquainted Meetings are alerted to the beginning of the meeting by applause, which is followed by the pledge of allegiance to the flag.

109. After the pledge of allegiance, the first speaker hurries to the front of the meeting room and is applauded, in accordance with the script.

110. The first speaker at the Get-Acquainted Meeting is usually an Executive Member or Membership Recruiter. He speaks for about five minutes. The first speaker talks about statistics obtained from an insurance company which show that 95% of all persons have not attained financial security by age 65.

111. The same or very similar insurance company statistics were used in Get-Acquainted Meetings for Koscot, Century 2000 and Exciting Life. The statistics were used to imply that a prospect could attain financial security through an investment with the yet unnamed company in an undisclosed business. The insurance company statistics are tied to the success concept central to Exciting Life.

112. The first speaker introduces a motion picture produced by Earl Nightengale entitled "The Strangest

Secret." The first speaker's introduction of the film is applauded.

113. The Earl Nightengale film runs approximately 23 minutes. It is intended to "wake-up" the prospect to the alleged fact that the average man is in a rut and does not realize it.

114. When the film ends, the first speaker hurriedly returns to the front of the meeting room and is applauded. After talking about the film for approximately five minutes, the first speaker introduces the second speaker.

115. Each speaker is directed to be applauded as he approaches the front of the meeting room and when he departs, in accordance with the script.

116. The second speaker is usually an Executive Member, Membership Recruiter or Area Director. He talks about success and tells prospects that the largest sum of money which they can invest is $5,000 or whatever figure happens to be the then going price for that particular business scheme. The second speaker tells prospects that they can earn $50,000 (or some other large figure) per year or more. $50,000 seems to have been the standard figure used.

117. The second speaker addresses the meeting for about ten minutes, but does not explain anything about the membership program.

118. The second speaker introduces the third speaker who similarly hurries to the front of the meeting room while the second speaker departs. Both are likewise directed to be applauded.

119. The third speaker is usually an Area Director or Executive Member. He addresses the meeting for about 10-15 minutes. He tells the prospects that the purpose of the meeting was just to help them get acquainted with representatives of the unnamed sponsoring organization. He also tells prospects that if they are interested in obtaining the described financial suc-

cess, they must spend two days with representatives of the sponsoring organization at a Weekend Meeting.

120. The third speaker tells prospects about Napoleon Hill's book, "Think and Grow Rich" and informs them that it is available for a small fee (usually one dollar) at the back of the meeting room as they leave.

121. The Get-Acquainted Meeting ends with applause. There are seven points in the standardized two hour meeting where the format of the meeting requires applause.

122. All of the meetings held by any of the Tolleson organizations, including those types which are described below, are filled from beginning to end with contrived excitement initiated and developed by Tolleson organization personnel, who operate much like a gambler's shill. There are loud shouts and chants related to money and success. The atmosphere created was described by many of the witnesses as akin to revival meetings or carnivals. The atmosphere was intended by the defendants, their agents and associates to break down sales resistance through mesmerization and peer group pressure.

123. After the Get-Acquainted Meeting, reservations are taken from prospects to attend a Weekend Meeting.

124. Originally, prospects attended Weekend Meetings at the expense of the sponsoring organization, but too many prospects attended just for the ride. In order to eliminate those not truly interested, the prospect was required to pay for the trip to and from, and the accommodations at, the weekend meetings.

125. These weekend trips were to Washington, D.C. and Orlando, Florida, for Koscot; to Florida and the Bahamas with Century 2000; and recently to Gettysburg, Pennsylvania for Exciting Life.

126. The prospects are contacted by State Developers during the period between the Get-Acquainted and Weekend Meetings.

127. The Get-Acquainted Meeting format does not vary unless a guest speaker, sometimes Rodney W. Tolleson, sometimes James E. Tolleson, and at other times someone from the home office, attends the meeting, in which case he is added to the program and the meeting is expanded.

128. The meeting room for the Get-Acquainted Meeting is paid for by State Developers and Executive Members who bring guests, the cost of which is shared pro rata among them. Sometimes a basket or hat was passed around for contributions from those in attendance.

129. On one occasion, Rodney W. Tolleson ordered a collection to be taken at the end of which he laughingly told the audience that their experience should teach them a lesson on the principle of how easy it is to obtain money.

### The Weekend Meeting

130. The Weekend Meeting is usually held at a motel or a place of public accommodation.

131. When James E. Tolleson began Weekend Meetings to sell Koscot distributorships to residents of the Commonwealth of Pennsylvania, the first several such meetings were held in Washington, D.C. in conjunction with other groups.

132. After several Weekend Meetings, James E. Tolleson began conducting Weekend Meetings in Orlando, Florida so that prospective purchasers could see the "International Headquarters."

133. Prospective purchasers of Koscot distributorships were transported to Orlando, Florida where they were accommodated in a motel. There were other such trips to such places as the Bahamas.

134. When Koscot prospects arrived in Orlando, Florida, they were told for the first time the sponsoring organization was Koscot Interplanetary, Inc.

135. On Saturday after their arrival, Koscot prospects were first shown a film showing the early Koscot office. After the film, they would eat and then they would tour the new Koscot facilities.

136. On Saturday night, Koscot prospects would attend a meeting at their motel where the business opportunity was explained. At that time, they were also told the price of a distributorship.

137. Koscot prospects were not solicited to purchase a distributorship until Sunday afternoon, at which time some agreed to buy and signed an application form. Those prospects who did not have a checkbook either made a down payment or utilized a counter check.

138. Exciting Life Weekend Meetings have most recently been held in Gettysburg, Pennsylvania and they follow a similar format. However, as time passed, the format became more polished and sophisticated. Of course, at Exciting Life Weekend Meetings, there was more talk of travel and self-motivation in keeping with the announced purposes of Exciting Life.

139. During the Get-Acquainted Meetings and the weekend trips, the Tollesons and their representatives displayed large sums of money, usually in thick wads, to prospective investors. One thousand dollar bills were often prominently displayed. This conduct was a planned part of the sales presentation.

140. During the Get-Acquainted Meeting and the meetings during the weekend trip, the Tollesons' representatives advised prospective purchasers of the various speakers' fantastic financial success in the organization.

141. The Tollesons and their agents, during meetings and during discussions with prospective purchasers, constantly made reference to expensive property which they allegedly had recently purchased through

their association with the Tollesons and their various organizations.

142. During these meetings and during discussions with prospective customers, James E. Tolleson often made reference to alleged plans to purchase airplanes, a stadium and the like in order to create the impression in the prospect's mind that James E. Tolleson is an extremely wealthy and successful businessman. Statements were made that James E. Tolleson was a millionaire, whereas in fact he was not.

143. Prospects to whom the Tollesons and their agents attempted to sell Century 2000 Executive Memberships were told that they could earn $50,000 per year by selling 500 Regular Memberships in Century 2000 for $200 each, for which they would receive a commission of $100 each.

144. Said prospects were advised by the Tollesons and their agents that it would be very easy to sell Century 2000 Regular Memberships in a short period of time, either several months or a year.

145. Prospects were told that individuals who had already purchased Executive Memberships in Century 2000 were having no difficulty selling Regular Memberships and that one of the Tollesons' agents had sold 9 memberships in one day while posing as a deaf mute and 90 memberships in three months, whereas, in fact, no single individual sold more than 20 Regular Memberships in Century 2000 from its inception in November 1972 until the Tollesons formed Exciting Life and terminated their relationship with Century 2000 in mid-February, 1973.

146. The Tollesons and their agents encouraged prospective purchasers to believe, and said purchasers did believe, that the individuals who conducted the meetings were Executive Members of Century 2000 and were obtaining the monetary gains said speakers constantly alluded to by selling Regular Memberships in

Century 2000. In fact, these agents who spoke about their personal success and earnings were engaged in selling Executive Memberships in Century 2000 for a commission of $1,800 per Executive Membership and were not selling Regular Memberships. In addition, these agents were not earning the amounts which they claimed to have earned, and had not purchased, but rather had leased the expensive possessions they referred to. Where the one thousand dollar bills came from was never explained.

147. Prospects who agreed to purchase Executive Memberships in Century 2000 or in Exciting Life were encouraged to sever all ties with their friends who would not join the program.

148. Prospective purchasers were instructed and encouraged not to inquire about the Tollesons and their organization prior to purchasing.

149. When borrowing money to pay the purchase price for distributorships or memberships, prospective purchasers were told by the Tollesons or their agents not to divulge the purpose of said loan.

150. Prospects were instructed to lie to lending institutions in order to obtain the purchase price. It was suggested that they tell said institutions that the money was for home improvements or dental bills or that they go to several institutions on the same day and borrow a portion of the money needed from each.

151. Prospects who asked questions concerning the details of the business involved were told that information would be supplied when they needed it, or as soon as the defendants' representatives could obtain it. They were also told that the defendants required that the money be paid within seven days and that they should invest immediately. However, defendants did not supply the requested information concerning the business involved, even after a prospect paid the purchase price.

152. The Tollesons did not disclose to prospective purchasers their previous connection with Glenn Turner and Koscot. When questioned, the Tollesons and their agents maintained that their operations bore no relation to Koscot or Glenn Turner. At the time of the hearings herein, James Tolleson still owned a Koscot distributorship (although inactive) and he admitted to still being a member of Turner's "Dare To Be Great" organization.

153. The Tollesons and their agents informed prospective purchasers that the Tolleson operation was using airplanes other than the Century 2000 plane because the Century 2000 plane was being used for pleasure trips by club members when, in fact, the Century 2000 plane either had been grounded by the Federal Government for purported violations of Federal regulations, or was otherwise unavailable to the members of Tollesons' organizations.

154. At a meeting in mid-February, 1973 to announce the change from Century 2000 to Exciting Life, it was announced that James E. Tolleson had purchased an airplane, which he had not.

155. The Tollesons knew that their relationship with Century 2000 would be terminated many weeks before it was announced, but they continued to solicit individuals to purchase Executive Memberships in Century 2000.

156. The Tollesons have not provided the support and assistance which they promised to prospects in order to induce them to invest money and they have made misrepresentations to prospective purchasers.

157. Individuals who purchased Executive Memberships in Century 2000 or Exciting Life have stopped attempting to sell Regular or Family Memberships because they have come to believe from their experiences that the Tollesons' organizations are fraudulent.

158. All of the forms, brochures, scripts, applications, books, letters, tapes and other paraphernalia used in the Tolleson operations are produced or supplied by one of the Tolleson organizations or by James E. Tolleson.

159. Many prospective purchasers of Executive and Regular Memberships in Century 2000, and Executive Member Franchises and Family and Regular Memberships in Exciting Life, were told, both at Get-Acquainted and Weekend Meetings and on an individual basis, that James E. Tolleson was a millionaire. Based upon this record, it is specifically found to be a fact that he is not a millionaire and further that such statements were intentional misrepresentations intended to unfairly induce prospects to purchase.

160. James E. Tolleson's adjusted gross income for the year 1970, for Federal income tax purposes on a joint return basis, was $25,459, which included $550 interest on bank deposits and no stock dividends. In 1971, his gross adjusted income, on the same basis, was $9,356, which included $637 interest and again no stock dividends. His total income from Koscot in 1971 was $3,263.

161. Prospective purchasers of Century 2000 Executive Memberships, and Executive Member Franchises and Family and Regular Memberships in Exciting Life, have been told at Get-Acquainted and Weekend Meetings that they could earn up to $50,000 per year or $50,000 in total selling Regular Memberships in Century 2000 and Family and Regular Memberships in Exciting Life. Not one person has ever earned this amount in one year or in total. There is no evidence that anyone even came close to that figure.

162. James E. Tolleson, Rodney W. Tolleson, State Developers employed by American Opportunities Unlimited, Inc. and others associated with the Tolleson operations encouraged prospective purchasers of Ex-

ecutive Memberships in Century 2000 and in Exciting Life to quit their jobs to work full time selling memberships and to buy new clothes and an expensive automobile.

163. Some prospective purchasers of Century 2000 and Exciting Life Executive Memberships were not told that they would incur additional expenses. All of the expense for all training at the national school in Florida was at the member's expense; and members paid for almost every form, document, meeting and lead after signing a contract with a Tolleson organization.

164. Prospective purchasers of Century 2000 and Exciting Life Executive Memberships were not told that State Developers earned their incomes from the sale of Executive Member Franchises.

165. The Exciting Life program used in the Commonwealth of Pennsylvania to attract Family Members is as follows:

(a) an individual may join the organization as a Family Member by investing $1,000.

(b) this individual may then bring in five new Family Members for each of which he receives a $200 commission and therefore recoups his initial investment.

(c) after obtaining these five new members, the individual becomes a Membership Recruiter and receives a 20% commission for any additional Family Members he recruits.

(d) said individual also receives a 10% override commission for any Family Member recruited by an individual whom he has recruited.

(e) no limitation is placed on the number of persons a Membership Recruiter may recruit or upon the number of persons those working for a Membership Recruiter may, in turn, recruit.

166. The Tollesons have failed to register any of the foreign corporations, mentioned herein, through

which they are conducting business in Pennsylvania, with the Commonwealth as required by the Act of May 5, 1933, P. L. 364, §1001, as amended, 15 P.S. §2001, and by the Act of July 11, 1957, P. L. 783, §5, 54 P.S. §85. They were advised of this requirement, and their failure to meet it, in open court, in June of 1973, and have failed to take any action thereon.

167. James E. Tolleson and Rodney W. Tolleson, as his assistant and agent, absolutely control all of the operations of the many organizations mentioned in Finding #4 hereof. They are found to be the principals who are in complete control and charge of all of their representatives and associates. These representatives and associates acted as and held themselves out to be the Tollesons' agents in all of the meetings, conferences, trips, courses and presentations described in the record.

168. It is specifically found that James E. Tolleson has changed his many organizations and operations in Pennsylvania to avoid court orders and evade the law.

169. The money representing the purchase price of a distributorship or subdistributorship in Koscot, paid by a prospect, was initially received by James E. Tolleson or Americans Be Independent.

170. All or part of the money representing the purchase price for an Executive Membership in Century 2000 was initially received by American Opportunities Unlimited, Inc.

171. The money paid by a prospect for an Executive Membership in Exciting Life was not received by the Exciting Life club he was joining, but rather by American Opportunities Unlimited, Inc.

172. The money paid by a prospect for a Family or Regular Membership in Exciting Life is not received by the club which the prospect is told he is joining, but

rather by some other undisclosed Exciting Life organization not registered to do business in Pennsylvania.

173. In all of the various ventures mentioned in these findings, the money paid or invested by the prospect is not received by the club or organization the prospect is told he is joining.

174. All of the monies received in payment for these various ventures, distributorships, businesses, or Memberships are received by unregistered corporations or organizations owned and solely controlled by James E. Tolleson; and none of these receiving companies have any binding written agreements with the club or organization which the prospect joins, whereby the interests of the prospect or member would be protected.

175. Under any and all of these Tolleson ventures, the purchase price or Membership monies are paid directly to a Tolleson organization, and James E. Tolleson has absolute control over how the money is used, distributed, invested or spent. The prospect or Member has no control whatsoever over the finances of the receiving Tolleson organization, and no assurance or protection that the inducement promises will ever be performed.

176. Under the scheme of financing of the various Tolleson organizations, the prospect or member has no protection whatsoever, except for the word of the Tollesons or their agents.

177. The prospect or member has no privity of contract with any of the Tolleson organizations which receive the member's money.

178. If James E. Tolleson would dissolve all of his organizations, save only that which the member joins, then the member would have no protection or assurance that the promises made in consideration of the purchase price paid would be fulfilled because the member's club has little or no assets.

179. All of the assets represented by the payments of purchase prices for memberships are to be found in other organizations or corporations wholly-owned or controlled by James E. Tolleson, which are not the organizations joined.

180. The representations by James E. Tolleson, Rodney W. Tolleson and their agents and associates concerning (a) the income and wealth of James E. Tolleson, (b) the income a prospect would or could receive for his investment, (c) the corporate structure of the club or company the prospect was being asked to join, (d) the assets of James E. Tolleson and his various organizations, (e) the ownership of airplanes by James E. Tolleson and (f) the income of the various agents and associates of James E. Tolleson, were all false.

181. The failure of James E. Tolleson, Rodney W. Tolleson and their agents and associates (a) to disclose their actual wealth and income, (b) to disclose the true nature of their various corporate structures and organizations, (c) to disclose where their members' monies were paid, and (d) to disclose at times their prior association with Glenn W. Turner and Koscot, was intentional and was designed to deceive prospects and members.

182. The emotional atmosphere contrived at meetings by James E. Tolleson, Rodney W. Tolleson, and their agents and associates, was intentionally designed to mislead and beguile prospects into signing agreements for James E. Tolleson's benefit.

183. After listening to all of the Napoleon Hill tapes and reading his book and other material made a part of the record, it is specifically found that none of this material is in any way misleading but to the contrary, would be of great help to anyone who carefully read and followed the advice of same. This finding, however, should not be used as the basis for any justification of the actions of the Tollesons or their agents,

for as will be pointed out in the discussion, they did not follow all of the recommendations of their own guru or teacher, Mr. Hill.

184. All of the State Developers, Executive Members, Team Leaders, Motivators, Area Coordinators, Area Directors, District Directors, Regional Directors, Membership Recruiters, Officers and Officials of all the various corporations, organizations or fictitious names, owned or controlled by James E. Tolleson or Rodney W. Tolleson were the agents of James E. Tolleson and Rodney W. Tolleson, and James E. Tolleson and Rodney W. Tolleson were their principals in all the meetings, conferences, trips, arrangements, agreements, promises, circumstances and other incidents disclosed in the record of this case.

DISCUSSION

After hearing all of the testimony and again reviewing same in preparation for this writing, the chancellor is convinced of the truthfulness of P. T. Barnum's statement that "there's a sucker born every minute." *See* Bartlett's Familiar Quotations, 14th Edition 1968, page 655. In trying to understand the actions of the prospects who became eventually members of one or more of the Tolleson organizations, one wonders how it is that the law, or a court interpreting and enforcing such law, can protect a citizen from his own greed or gullibility. The United States Supreme Court has given us some guidance in this regard in *Federal Trade Commission v. Standard Education Society,* 302 U.S. 112, 116, 58 S. Ct. 113, 115 (1937), where it said: "The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business. Laws are made to protect the trusting

as well as the suspicious. The best element of business has long since decided that honesty should govern competitive enterprises, and that the rule of caveat emptor should not be relied upon to reward fraud and deception."

In 1968 our General Assembly passed the Act here in question. Section 3 of the Act, 73 P.S. §201-3 states in pertinent part that: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The terms "unfair methods of competition" and "unfair or deceptive acts or practices" are given the following definitions, among others, in Section 2(4), 73 P.S. §201-2(4):

"(ii)  Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

"(iii)  Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

. . . .

"(v)  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

. . . .

"(vii)  Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

. . . .

"(xii)  Promising or offering to pay, credit or allow to any buyer, any compensation or reward for the procurement of a contract of purchase with others;

"(xiii)  Engaging in any other fraudulent conduct which creates a likelihood of confusion or of misunder-

standing." Section 4 of the Act, 73 P.S. §201-4, authorizes the Attorney General to bring action in the name of the Commonwealth against any person violating the Act "to restrain by temporary or permanent injunction the use of such method, act or practice." The last sentence of Section 4 specifically states the jurisdiction of this Court: "The said courts are authorized to issue temporary or permanent injunctions to restrain and prevent violations of this act, and such injunctions shall be issued without bond." The burden of proving its allegations of violations of the Act is, of course, on the Commonwealth. Our review of the record in this case permits us to conclude that the Commonwealth has met its burden.

The Commonwealth has alleged that the Tolleson sales system is a referral sales system and thus inherently fraudulent. The forerunner of referral sales was the chain letter which was fraudulent because the geometric progression of participants in the chain makes necessary an infinite or endless supply of participants. In utilizing just five names in a chain letter, the simple mathematical calculation demonstrates that at the twelfth progression the entire population of the United States would be needed to participate in the scheme. Chain letters have been declared to be illegal lotteries in at least six states.[4] Referral selling was the next development in the endless chain concept. In a referral sale scheme, the price of a product is inflated beyond its competitive market price so as to make room for another item of cost, mainly the referral fee of the seller. The prospective purchaser is induced to purchase by a promise that for every additional sale which he procures, he receives a commission. A prospect in a referral sales scheme is told that he can quickly re-

---

[4] *See* Fla. Stat. Ann. §849.091; La. Rev. Stat. §51:361; 271 Mass. Ann. Laws §6A; Nev. Rev. Stat. §598.100 et seq.; N. C. Gen. Stat. §14-291.2; Tenn. Code Ann. §39-2017.

coup his investment and then easily make additional money. Referral sales schemes were carried out in the sales of encyclopedia, remodeling, aluminum siding, storm windows, carpeting, etc. A referral sales scheme relies upon the well-known fact that almost everyone wants to get something for nothing. Referral sales are inherently fraudulent because there is no infinite number of purchasers for any particular product or service. Referral sales schemes have been declared to be illegal in at least thirteen states.[5]

Because obtaining a product to sell is the most difficult and expensive task in a referral sales scheme, the next development involved pyramiding, which is a scheme whereby what is sold is really the right to sell (another like franchise to sell) and the product is de-emphasized. Under this scheme, a visible "product" (such as cosmetics, cleaning fluids, vacuum systems, etc.) serves as the vehicle upon which the sale to the public of distributorships or franchises is based. Here the customer purchases a right, not only to receive the ostensible product for a price less than he receives from the next person in the distribution chain, but also the right to receive a remuneration for the recruiting of additional investor-distributors or franchisers. It is interesting at this point to note that in the Tolleson brief there is an admission that Koscot's pyramid sales scheme was fraudulent. Pyramid sales have been declared illegal by statute in at least ten states.[6] In some

---

[5] Ariz. Rev. Stat. Ann. §44-5003; Cal. Civil Code Ann. §1770; Conn. Stat. Rev. §42-140; Fla. Stat. Ann. §849.0915; Ind. Stat. Ann. §19-15-103; Iowa Code Ann. §713.24(2)(b); Kan. Stat. Ann. §50-603; Ky. Rev. Stat. Ann. §436.360; La. Rev. Stat. §9:3536; 83 Md. Anno. Code §21C; Ohio Rev. Code Ann. §1345.02(C); 21 Okla. Stat. Ann. §1066; Oreg. Rev. Stat. §646.608(o).

[6] Ark. Stat. Ann. §70-905; Fla. Stat. Ann. §849.091; Ky. Rev. Stat. Ann. §436.360; 17 Me. Rev. Stat. Ann. §2305; Nev. Rev. Stat. §598.100 et seq.; N. C. Gen. Stat. §14-291.2; 21 Okla. Stat. Ann.

other states, regulatory laws addressed to multi-level sales companies have been enacted.[7]   Pennsylvania regulates pyramid sales by making referral sales illegal.  *See* Section 2(4)(xii) of the Act, 73 P.S. §201-2(4)(xii).

The Tollesons contend that they have not violated any provisions of the Act because under their reasoning they are not involved in "pyramiding sales" or true "referral sales."  Rather they proffer that by comparison with other cases condemning and enjoining such sales, they have found a way to circumvent the law and thereby become legitimate.  The Tollesons would have us determine that their operations are akin to the modern franchise and distributorship businesses which have recently developed in this country.

The Tollesons were aware of the legal questions surrounding Glenn W. Turner's Koscot operation.  Therefore, the Tollesons attempted to design a new approach whereby they would accomplish the same results through a different business structure.  Whether it was Century 2000 or Exciting Life, the Tollesons contend that their structure involved (1) the "business" and (2) "product."  The "business" was the Executive Membership which included the rights to sell the "product."  The "product" was the intangible membership in a club, which could be solely a travel club (Century 2000) or a travel and motivation club (Exciting Life).  In the Tolleson system, the Executive Member is given the right to sell memberships, i.e., the "product"; but ostensibly he is not given the right to sell another Executive Membership, i.e., the "business."  The Executive Memberships were sold by commissioned sales representatives.  The Tollesons contend that because not all

---

§1066; Tenn. Code Ann. §39-2017; Va. Code Ann. §59.1-67.1 et seq.; W. Va. Code Ann. §47-15-1 et seq.

[7] 83 Md. Ann. Code §166; 93 Mass. Ann. Laws §69; S. D. Code §§37-25-1 to 37-25-28.

Executive Members were sales representatives, their system was not a pyramid sales system and not illegal under the Pennsylvania Act. However, this record permits us to conclude that that tantalizing possibility of participation in the sale of the "business" was dangled before the prospect through innuendo and inference in an attempt to intentionally evade the law. The prospective Executive Member was never told that he could not become a sales representative; rather the prospect was given the impression that through the largess of James Tolleson he could become involved in the "business" aspects of the organization.

The main thrust of the Tollesons' defense in this case is their contention that there is insufficient evidence to substantiate a finding of fact that any purchaser of a Tolleson "business" (Executive Membership) was ever induced to buy on the representation that the purchase would qualify him to sell the "business" and thereby recoup his purchase price. The problem with that contention is, as the findings of fact disclose, that there is evidence, believed by the chancellor, that such representations were made by Tolleson agents in order to induce purchases. Tolleson agents represented that, either upon the purchase of the Executive Membership or upon the purchase of the Executive Membership plus the sale of a number of Regular Memberships, the purchaser could become a seller of Executive Memberships. It may be true that not all commissioned Tolleson salesmen are Executive Members but the record supports the conclusion that the salesmen are comprised almost entirely of individuals who have purchased either a Koscot franchise or an Executive Membership (Century 2000 or Exciting Life) from the Tollesons. Despite the alleged differences, it is clear that the present Tolleson sales system, like its Koscot predecessor, is an illegal referral sales system. *See* Section 2(4)(xii) of the Act, 73 P.S. §201-2(4)

(xii). In *Kugler v. Koscot Interplanetary, Inc.,* 120 N.J. Super. 216, 232 (Ch. Div. 1972), the court defined a referral sales program as follows: "It is an arrangement whereby one is induced to buy upon the representation that he can not only regain his purchase price, but also earn profits by selling the same program to the public." The Tolleson sales system fits neatly within this definition. The law was violated because the inducement to buy was the offer of the opportunity to sell the same program to the public.

The Tolleson sales system not only involved referral selling in violation of Section 2(4)(xii) of the Act, 73 P.S. §201-2(4)(xii), it also involved many other actions which are defined in the Act as "unfair methods of competition" or "unfair or deceptive acts or practices." *See* Section 2(4) of the Act, 73 P.S. §201-2(4). For example, the Tollesons and their agents consistently failed to disclose information concerning their business structure. Even in court, the Tollesons failed to disclose the worth of their various corporations. The Tollesons and their agents refused to answer questions pertaining to their business structure or else gave evasive answers to such questions. The record even shows that the Tollesons failed to disclose information concerning their complicated corporate structure to their own high-level agents. All of these actions caused a "likelihood of confusion or of misunderstanding" as to the source of the services offered by the Tollesons. *See* Section 2(4)(ii) of the Act, 73 P.S. §201-2(4)(ii). The consistent untruthful references to ownership of 51% of a corporation (Century 2000) which they did not in fact control certainly come within the provisions of Section 2(4)(iii) and Section 2(4)(v) of the Act. Even as late as the hearings before the chancellor, James Tolleson stated for the record that he owned 51% of Century 2000 and later, when it developed in the record that this was not true, there was an attempt to explain

it away as a misunderstanding on James Tolleson's part. The fact that such a reckless representation was made in court and under oath serves to strengthen the evidence in the record that many such reckless assertions were made to prospects by the Tollesons and their agents. Those reckless assertions caused a likelihood of confusion or misunderstanding in violation of Section 2(4)(ii) and Section 2(4)(iii) of the Act. The continued sale of Century 2000 memberships after the decision to break with Century 2000 also caused a likelihood of confusion or misunderstanding in violation of the same sections of the Act.

The obvious lack of concern for the accuracy of the representations made by the Tollesons and their agents is the type of deceptive practice prohibited by the Act. Some examples of the distortions of the truth or complete untruths made by the Tollesons were:

(1) That James Tolleson owned 51% of Century 2000.

(2) That James Tolleson owned or held the controlling stock in Century 2000.

(3) That James Tolleson is a millionaire.

(4) That James Tolleson owns yachts or airplanes.

(5) That James Tolleson had no connection with Glenn W. Turner. (James Tolleson admitted in his testimony that he is still a member of "Dare To Be Great.")

(6) That an Executive Member could easily earn large amounts of money.

(7) That the golden eagle lapel button was worn only by people who earned more than $100,000 with the Tollesons.

Many elements of the Tolleson sales system are not in and of themselves illegal. Merely sending out a letter of enticement is not a violation of the Act. The holding of a contrived meeting with manufactured excitement developed by shills may not be necessarily a

violation of the Act. Certainly the display of large sums of money, the singing of songs and the saluting of the flag cannot be deemed illegal in and of themselves. High-pressure salesmanship, in and of itself, is not prohibited by the Act. The Tollesons' problem, however, is that putting all of these, what might be otherwise legitimate operations, together as part of an overall scheme to obtain a citizen's money for the ostensible purpose of joining a club, when the club is not registered in the Commonwealth and when the club is not in fact the organization to which the prospect or member's money eventually is deposited, smacks of fraud.

### RESTITUTION

One of the prayers of the complaint of the Commonwealth seeks an order of restitution to all Pennsylvania residents who have purchased memberships in Century 2000 or Exciting Life through the Tollesons. We have held that this Court does not have jurisdiction to order restitution in this type of case. *See Commonwealth v. APSCO,* 10 Pa. Commonwealth Ct. 138, 309 A. 2d 184 (1973) ; *Commonwealth v. Monumental Properties, Inc.,* 10 Pa. Commonwealth Ct. 596, 314 A. 2d 333 (1973). As we view our jurisdiction in these cases, we are restricted by the constitutional provision which states that the Commonwealth Court has such jurisdiction as is provided by law. *See* Pa. Const. art. V, §4.

Although we believe it would be entirely appropriate and helpful for the Legislature to give this Court broad equity powers in this type of case, the Legislature has not done so. The present language in the Act merely states that we are authorized to issue temporary or permanent injunctions to restrain and prevent violations of the Act. This is a statutory remedy and we are limited to the powers given to us by the General Assembly. We believe however that we may declare con-

tracts, entered into subsequent to and in violation of an injunction of this Court, to be illegal and voidable.

## CONCLUSIONS OF LAW

1. The Attorney General of the Commonwealth of Pennsylvania properly brought suit in this Court seeking temporary and permanent injunctions against James E. Tolleson and Rodney W. Tolleson to restrain them and prevent them from violating the provisions of the Unfair Trade Practices and Consumer Protection Law, Act of December 17, 1968, P. L. 1224, 73 P.S. §201-1 et seq.

2. Although the Tollesons are citizens of a foreign state, namely Florida, they are subject to the Act because they operated and did business in the Commonwealth of Pennsylvania during the times complained of, and did so through unregistered corporations and fictitious names.

3. The utilization by the Tollesons of their many and diversified corporations, organizations and fictitious names without full disclosure to their prospective customers or even to their own agents and representatives was a violation of Section 2(4)(ii) of the Act.

4. The utilization of the names Exciting Life, Exciting Life Travel and Success Club, Exciting Life, Inc. (Florida not-for-profit corporation), Exciting Life, Inc. (Delaware corporation) and Exciting Life Enterprises, Inc. (Delaware corporation) by the Tollesons without full disclosure to their prospective customers or even to some of their agents and representatives was in violation of Section 2(4)(ii) of the Act.

5. The utilization of American Opportunities, Inc. and Exciting Life, Inc. (Delaware profit corporation) as the recipient of the monies paid by applicants for membership in Century 2000 or Exciting Life whereby none of the monies paid by such applicants were accounted for or paid to the organization which the mem-

bers ostensibly joined was a violation of Section 2(4)(ii) of the Act.

6. The misleading and false statements of the Tollesons concerning the ownership of stock in Century 2000 were a violation of Section 2(4)(iii) of the Act.

7. Statements made to prospective members by the Tollesons and their agents concerning the ownership of airplanes were a violation of Section 2(4)(iii) of the Act.

8. After the Tollesons had made a decision to split with Century 2000 and organize Exciting Life, the continuation of Century 2000 sales without full disclosure to prospective members was a violation of Section 2(4)(iii) of the Act.

9. Statements made by agents and representatives of the Tollesons concerning stock in JET Travel Service, Inc., the value of such stock, and the availability of same, were a violation of Section 2(4)(iii) of the Act.

10. In the marketing structure employed by the Tollesons in the promotion and sale of all types of memberships in both Exciting Life and Century 2000, promises or offers were made to purchasers of all types of memberships concerning payments, credits or allowances for the procurement of contracts of purchase with others, and statements were made concerning the availability of positions as salesmen in order to induce prospects to purchase memberships. Therefore, the entire Tolleson sales system, at all levels of sale, was an illegal referral sales system under Section 2(4)(xii) of the Act.

11. The use of the multiple corporations by the Tollesons to promote, sell and service Executive and Regular Memberships in Century 2000 and Executive, Family and Regular Memberships in Exciting Life, together with the absence of any disclosure concerning the corporations involved, caused a likelihood of confu-

sion and misunderstanding and amounted to fraudulent conduct in violation of Section 2(4)(xiii) of the Act.

12. The Tollesons' complicated corporate structure, together with the absence of any disclosure concerning that structure, made it certain that purchasers of any type of membership in either Century 2000 or Exciting Life would be confused concerning the roles of, the status of, the relationship among and the affiliation of persons with the various corporations owned or controlled by the Tollesons. Therefore the Tollesons' use of said corporate structure without full disclosure constituted a violation of Section 2(4)(ii) and Section 2(4)(iii) of the Act.

13. There is evidence in the record to support the finding of the Court that, when dealing with prospective purchasers of all types of memberships in both Century 2000 and Exciting Life, the Tollesons or their agents intentionally misrepresented, or without regard for the truthfulness of their statements unintentionally misrepresented, pertinent and necessary facts, including facts concerning the roles of, the status of, the relationship among and the affiliation of persons with the various corporations owned or controlled by James E. Tolleson. These intentional or reckless misrepresentations were unlawful under Section 2(4)(v) of the Act.

14. The failure to register foreign corporations, and the failure to register other unincorporated organizations and trade names as provided by the laws of the Commonwealth of Pennsylvania, was a pertinent misrepresentation which caused a likelihood of confusion or of misunderstanding in violation of Section 2(4)(ii), Section 2(4)(iii) and Section 2(4)(xiii) of the Act.

15. The following enumerated acts by the Tollesons and their agents, taken together as a whole constituted fraudulent conduct which created a likelihood of confusion or of misunderstanding in violation of Section 2(4)(xiii) of the Act:

(a) The mailing of an enticement letter without disclosure of the name of the company involved or the business being promoted.

(b) The staging of Get-Acquainted Meetings with a carnival-like exciting atmosphere contrived through shills, with displays to prospects of large denomination bills, and with unsupported and false promises concerning annual or total incomes.

(c) Weekend trips to out-of-state cities during which prospective members were again exposed to carnival-like meetings, at which peer pressure was applied, false statements were made, and evasive answers were given, in order to break down the sales resistance of prospective members.

(d) Throughout all these contacts, the false representations made by the Tollesons and their agents concerning the wealth and financial success of the Tollesons and their agents and the representations that the alleged wealth had been acquired through membership in one of the Tolleson organizations, together with the intentional exposure of prospects to a facade of expensive automobiles, clothes, jewelry and other indicia of great wealth.

(e) The failure to disclose the corporate structure, the finances, the distribution of the members' money, and the lack of agreements written or otherwise between the various corporations and individuals operating under the Tollesons.

(f) The failure of the Tollesons and their agents to honestly answer the inquiries made by prospective members and members.

16. The various Corporate Officers, Officials, Directors, Sales Representatives, State Developers, Executive Members, Team Leaders, Motivators, Area Coordinators, Area Directors, District Directors, Regional Directors and others (as may be disclosed in the record) of the applicable and respective corporations and or-

ganizations of James E. Tolleson or Rodney W. Tolleson were all agents of James E. Tolleson or Rodney W. Tolleson. All of these agents derived their power, authority, direction and instruction from the Tollesons and the Tollesons were responsible for the actions of these agents.

17. A representation in a business transaction which the maker knows to be capable of two interpretations, the one false and the other true, if made with the intention that it be understood in the sense in which it is false, is a fraudulent misrepresentation. The Tollesons and their agents made such fraudulent misrepresentations.

18. A statement in a business transaction which states the truth so far as it goes, but which the maker of the statement knows or believes to be materially misleading because of the failure of the maker to state qualifying matter, is a fraudulent misrepresentation. The Tollesons and their agents made such fraudulent misrepresentations.

19. A misrepresentation is fraudulent if it is made with the intent to cause the person to whom it is made to act in reliance upon it in the transaction or type of transaction in which the maker intended to influence their conduct. The Tollesons and their agents made such fraudulent misrepresentations.

20. The reliance by the recipient of a fraudulent misrepresentation in a business transaction must be justifiable; and in this case most of the recipients' reliance was justifiable.

21. Reliance upon a fraudulent misrepresentation of fact in a business transaction is justifiable if the fact misrepresented is material; and some of the facts relied upon by the prospects of the Tollesons or their agents were material.

22. The recipient in a business transaction of a fraudulent misrepresentation is not justified in relying

upon its truth if its falsity is obvious; but in this case, the recipients were justified because the falsity was not obvious.

23. The recipient in a business transaction of a fraudulent misrepresentation of intention is justified in relying thereon if the existence of the intention is material and the recipient has reason to believe it will be carried out; and in this case the intention was material and the recipient had reason to believe that it would be carried out.

24. One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction has engaged in a fraudulent conduct to the same extent as if he had represented the nonexistence of the matter which he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable due care to disclose the matter in question; and under the facts of this case, the Tollesons had a duty to disclose the matters in question.

25. There is sufficient evidence in the record to support a finding that representations that James E. Tolleson was a millionaire were false at the time of their utterance. The Commonwealth met its burden of proving the falsity of these representations.

26. Representations made by the Tollesons and their agents that prospective purchasers of Executive Memberships in Century 2000 or Executive Member Franchises in Exciting Life could earn up to $50,000 in any specific period of time were representations not only as to events which might occur in the future, but also were representations of present salaries which existing members had attained, and therefore constituted fraudulent misrepresentations.

27. Under the conditions completely fabricated and contrived by the Tollesons and their agents, a reasonable man would rely upon the representations made to

the prospective members of either Century 2000 or Exciting Life that they could earn $50,000 per year or in total.

28. There is evidence to support a finding that persons wore a gold eagle on their lapels who did not earn over $100,000 per year and therefore the representations made concerning golden eagles and their symbolism were fraudulent misrepresentations.

29. The Tollesons and their agents owed a duty to all prospective purchasers of Century 2000 and Exciting Life memberships to disclose to them that they would incur additional expenses for training and materials which duty was not performed, and thereby created a likelihood of confusion or misunderstanding.

30. The failure of the Tollesons and their agents to fully and adequately distinguish to prospective purchasers of Century 2000 and Exciting Life Executive Memberships, the earnings of State Developers through the sale of Executive Memberships, from the earnings of Executive Members through the sale of Regular and Family Memberships, constituted fraudulent conduct.

31. The statements by the Tollesons and their agents advising prospects to lie to banks in order to get loans were fraudulent conduct in violation of Section 2(4)(xiii) of the Act.

32. The intentional failure of the Tollesons and their agents to disclose to prospective members in both Century 2000 and Exciting Life that a yearly membership fee was required in addition to the initial purchase price was fraudulent conduct in violation of Section 2(4)(xiii) of the Act.

### SUMMARY

Because this is a case of first impression[8] in the appellate courts of this Commonwealth, we have attempt-

---

[8] We have rendered opinions in other cases involving the Unfair Trade Practices and Consumer Protection Law, *supra*, but none

ed to exhaustively review this extensive record to obtain a full understanding of what it was the Tollesons were all about. That review justifies our observation that the Tollesons have cleverly attempted to circumvent the law by the constant maneuvering from the sale of cosmetics, to air travel, to motivation, from franchises to distributorships, to memberships of many classes through a complex maze of corporate structures and fictitious names. Although their attempt was to operate so as not to offend a court order or statutory provision, it seems clear that each of these schemes like all get rich quick schemes was defective. The Tollesons showed a complete disregard for even the most obvious legal requirement of registering corporate or fictitious names, even after attention was called to that fact many months ago in open court. The constant making of statements with complete abandon as to the reliability or factual substantiation was the very kind of thing against which the Unfair Trade Practices and Consumer Protection Law was directed by the Legislature. Throughout this record the Tollesons made constant reference to the writings and tape recordings of Napoleon Hill, a man whose reputation is widespread in the field of motivation and positive thinking. Napoleon Hill's most successful book, *Think and Grow Rich,* published in 1960, is an excellent treatise on the power of positive thinking and self-discipline. The chancellor read all of these documents and listened to all of the tape recordings submitted into evidence; and without reservation the chancellor concludes that there is absolutely nothing wrong or illegal with any of these presentations of Napoleon Hill. Although the Tolle-

of these dealt with referral sales, e.g., *see Commonwealth v. Lewis Rozman,* 10 Pa. Commonwealth Ct. 133, 309 A. 2d 197 (1973) ; *Commonwealth v. Emdeko Int., Inc.,* 5 Pa. Commonwealth Ct. 479 (1972) ; and *Commonwealth v. Hush-Tone Industries, Inc.,* 4 Pa. Commonwealth Ct. 1 (1971).

sons rely heavily upon the writings of Napoleon Hill as the basis for their motivation courses, it is interesting indeed that the Tollesons have not accepted everything which Napoleon Hill has written. For instance, he states in his book, "Without a sense of fairness and justice, no leader can command and retain the respect of his followers."[9] The many bitter statements of the Commonwealth's witnesses, who at one time were followers of the Tollesons, indicate the truth of Hill's statement. Hill also says, "The leader who is not loyal to his trust, and to his associates, those above him, and those below him, cannot long maintain his leadership."[10] Another quote, "There is no substitute for honesty. One may be temporarily dishonest by force of circumstances over which one has no control, without permanent damage. But, there is no hope for the person who is dishonest by choice. Sooner or later, his deeds will catch up with him, and he will pay by loss of reputation, and perhaps even loss of liberty."[11] And, "Searching for all the short-cuts to riches, trying to get rich without giving a fair equivalent, usually reflected in the habit of gambling, endeavoring to drive sharp bargains" are weaknesses which Napoleon Hill deplores.[12] Throughout all of these writings of Napoleon Hill one finds a thread of honorable intentions. Somewhere in the development of the Tolleson organization that thread slipped from the needle and left a flaw in the whole Tolleson cloth. To be sure, there is nothing improper with selling cosmetics, organizing a licensed travel club or even selling motivation courses. As this record mentions, Dale Carnegie became famous and wealthy with such courses. This record would indicate

---

[9] Napoleon Hill, *Think And Grow Rich*, p. 105, Fawcett Publications, Inc. (1960).

[10] *Id.* at 109.

[11] *Id.* at 125.

[12] *Id.* at 159.

that the thread of honesty was lost early in the game when James Tolleson commenced to utilize fictitious names and nonexistent corporations as the depositories for the funds he received from the members who joined his various organizations. Members joined Century 2000, but their money went to a company called American Opportunities. Later, members joined Exciting Life, but no one told them that there were three, or perhaps even four, different organizations called Exciting Life by the Tollesons and their agents. What connection the Exciting Life the members joined had with the Exciting Life which was the depository of the funds was never disclosed. This record discloses that it was only through the prodding of the chancellor, and with the assistance of counsel for the Tollesons, that the existence of the various Exciting Life corporations was finally disclosed long after the Tollesons had been given the opportunity to fully explain on the witness stand. Although the question was asked several times on the record, the Tollesons never answered how any member in any of these organizations was protected once his money was received by some Tolleson corporation or organization not privy to the contract. Every opportunity was afforded the Tollesons to prove the legitimacy of their corporate structure and operations. Instead of clarity, they presented confusion and evasion. Perhaps the most telling bit of evidence in the record as to the Tollesons' dishonorable intentions came when two of the Tollesons' trusted lieutenants disclosed that they did not know of the existence of the various Exciting Life corporations, or how they were related to each other and to the Tollesons. In summary, this record sets forth that kind of business operation against which the Act was directed.

The record discloses that at the hearing we withheld ruling on the Tollesons' motion for a compulsory nonsuit. We will deny that motion in our order. As

our findings of fact and conclusions of law dictate, we must enter a permanent injunction enjoining the Tollesons from any such operation within the confines of the Commonwealth of Pennsylvania.

After having found, concluded, held and said all of the above, this Court now faces the perplexing task of designing an appropriate permanent injunction order. It is perplexing because this record exposes the fact that the Tollesons and their enterprises tend to change with the wind. If we merely enjoin their many existing companies and organizations, and they follow their prior pattern, then they will form new organizations on the very next day, with new schemes and new products. The task is also perplexing because we know of no way a court effectively can protect citizens, or the buying public, from their own gullibility and greed. We also recognize that however we design the order, we cannot enjoin the Tollesons from legitimate endeavors. In any event, we must make it clear that the business structures and sales methods which the Tollesons have used in this Commonwealth from July of 1971 to date, as set forth in this record, violate the laws of this Commonwealth and must cease immediately.

We therefore,

### ORDER

AND Now, this 19th day of June, 1974, after hearing, submission of briefs, and oral argument, based upon the record made and the above opinion, the defendants' motion for a compulsory nonsuit is hereby denied, and it is ordered that James Tolleson and Rodney Tolleson (also known as James E. Tolleson and Rodney W. Tolleson), all of their corporations, organizations, clubs and other entities, and their agents, representatives, servants and employes be and they hereby are permanently enjoined from:

1. Conducting any business in the Commonwealth of Pennsylvania through any corporations, organizations, fictitious names or clubs not registered to do business in the Commonwealth of Pennsylvania as provided by law.

2. Offering for sale any memberships, including Executive Memberships, Regular Memberships or Family Memberships, in any corporation, organization, or fictitious name or club under which any member receives a commission or fee for the selling or procuring of any other membership of any class.

3. Offering any product or service to anyone without such full disclosure as is required by law.

4. Accepting monies, dues, fees or commissions from anyone without full disclosure of where and to whom the monies will be paid in those situations where the organization or personnel of James Tolleson or Rodney Tolleson receiving such money is other than that organization or person to which or to whom the payor intends such money to be received.

5. Failing to fully disclose all of the finances, balance sheets and income statements of themselves and any corporation, organization, fictitious name or club they control to authorized representatives of the Commonwealth of Pennsylvania, or to anyone entitled thereto, as may be required by law.

6. Operating any pyramid or referral sales business in violation of the law.

7. Operating any travel club without the required licensing, registration or other filing that may be required by law.

8. Operating any business in the manner of their operation of Century 2000, Inc. and Exciting Life, Exciting Life Enterprises, Inc., Exciting Life, Inc. (Florida not-for-profit), Exciting Life, Inc. (Delaware profit corporation), Exciting Life Travel and Success Club as disclosed by the record in this case.

9. Utilizing any of the application forms or agreements used to this date in the Commonwealth of Pennsylvania in the operation of any of the Exciting Life organizations named above.

10. Misrepresenting the facts of any matter to any purchaser of any product or service to anyone within the Commonwealth of Pennsylvania, including out-of-state persons.

11. Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services.

12. Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another.

13. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have.

14. Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another.

15. Promising or offering to pay, credit or allow to any buyer, any compensation or reward for the procurement of a contract of purchase with others.

16. Engaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding.

17. Operating any corporation, organization, fictitious name or club in the Commonwealth of Pennsylvania without annually giving every person who joins or invests in same a complete annual balance sheet and income statement prepared or certified by a Certified Public Accountant licensed to do business in the Commonwealth of Pennsylvania.

18. Selling any stock or membership in any registered or unregistered corporation or organization in violation of the law.

19. Permitting any agent, representative or employe to make any fraudulent or intentionally misleading statement to any prospective purchaser of any product or service offered by them or any of their organizations.

It is also ordered that James Tolleson and Rodney Tolleson shall mail, by registered return receipt mail service, a true and correct copy of this order to all persons who signed agreements with, and paid money into, any of the Exciting Life organizations mentioned above and to all persons who purchased any membership in Century 2000, Inc. through James Tolleson or Rodney Tolleson or any of their agents or organizations, within 60 days from the date hereof and shall within 30 days thereafter file with the Prothonotary of the Commonwealth Court of Pennsylvania a proof of service noting the names and addresses of all such persons to whom a copy of this order has been sent. All costs to be paid by James Tolleson and Rodney Tolleson, jointly and severally. This order shall become final if exceptions are not filed within 20 days from the date hereof.